# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MOHAMMED MAHRAN,                               )
                                               )
      Plaintiff,                               )
                                               )    No. 17 C 5730
  v.                                           )
                                               )    Judge Sara L. Ellis
ADVOCATE HEALTH AND HOSPITALS                  )
CORPORATION, an Illinois not-for-profit        )
Corporation, and ADVOCATE CHRIST               )
MEDICAL CENTER, an Illinois not-for-profit     )
Corporation,                                   )
                                               )
      Defendants.                              )

## OPINION AND ORDER

After his alleged failure to comply with a performance improvement plan led to his

termination, Plaintiff Mohammed Mahran, an Egyptian Muslim, filed this employment

discrimination suit against Defendants Advocate Health and Hospitals Corporation ("Advocate

Health") and Advocate Christ Medical Center ("Advocate Christ").[1]  Mahran brings the

following claims: (1) discrimination based on religion and national origin under Title VII of the

Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000 *et seq.* and the Illinois Human Rights

Act ("IHRA"), 775 Ill. Comp. Stat. 5/1-101 *et seq.* (Counts I, II, IV, V, VII); (2) retaliation in

violation of Title VII and the IHRA (Counts III and VIII); (3) denial of overtime pay under the

Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* (Count V); (4) hostile work

environment and discriminatory harassment based on race and/or national origin in violation of

42 U.S.C. § 1981 (Count VI); and (5) retaliatory discharge under Illinois common law (Count

---

[1] Because the parties do not clearly differentiate between Advocate Health and Advocate Christ, referring generally to Advocate, and they have presented no argument as to treating them separately or collectively aside from noting that Advocate Christ is a division of Advocate Health.  The Court collectively refers to the two Defendants as Advocate and does not differentiate between the two in this Opinion, except where the difference is clear.

IX).  After discovery, Advocate filed a motion for summary judgment on Mahran's claims, which the Court grants with respect to those claims addressed in the parties' briefing.  Mahran has not created a genuine issue of fact as to whether Advocate committed the actionable adverse employment actions of which Mahran complains because of his race, national origin, or religion. Mahran also cannot prevail on his hostile work environment claims because a reasonable factfinder could not find Advocate subjected him to an objectively offensive work environment. The IHRA preempts Mahran's common law retaliatory discharge claim, and his Title VII and IHRA retaliation claims fail for lack of a causal connection between the protected activity and the actionable adverse actions.  Finally, Mahran cannot pursue his FLSA overtime claims because he qualifies as an exempt employee under the FLSA.

BACKGROUND[2]

## I.     Mahran's Background

Mahran obtained his bachelor's degree in pharmacy from Cairo University in Egypt in 1997 and a master of business administration from Leicester University in the United Kingdom in 2004.  Mahran worked as a hospital pharmacist at Maadi Hospital in Cairo, Egypt from 1997 to 1998.  He then held jobs as a medical representative and marketing manager for Bristol Myers Squibb and Pfizer from approximately 1998 to 2011.  Having moved to Illinois, Mahran sought clinical experience at Advocate in February 2012 to fulfill the requirements of becoming a licensed pharmacist in Illinois.  Rolla Sweis, Advocate Christ's pharmacy director who is Jordanian Orthodox, interviewed Mahran and submitted a sponsorship application to the Illinois State Board of Pharmacy.  But the Board approved a sponsorship application from Naperville Pharmacy instead.  Mahran worked at Naperville Pharmacy first as an intern, and, once he

---

[2] The facts in this section are derived from the Joint Statement of Undisputed Material Facts and the additional facts included in Mahran's response.  All facts are taken in the light most favorable to Mahran, the non-movant.

obtained his Illinois pharmacy license in 2013, as a pharmacist. Through an agency, he then obtained positions with the Cook County Health and Hospitals System and MS Pharmacy.

## II.    Mahran's Employment at Advocate

On April 10, 2013, Mahran contacted to Sweis to apply for a pharmacist position at Advocate. Sweis encouraged Mahran to apply online, indicating that Advocate had open positions for registry pharmacists, who worked as needed, and should have full-time positions in the fall. Mahran applied and interviewed with several individuals, including Judith Brown-Scott, Advocate Christ's pharmacy manager and an African American Christian. Brown-Scott supported hiring Mahran based on his industry experience and practice in Egypt, and Advocate hired Mahran as a registry pharmacist, effective November 18, 2013. Mahran reported to Brown-Scott. Both Sweis and Brown-Scott knew that Mahran was an Egyptian Muslim.

Advocate Christ's pharmacy department includes approximately 150 to 160 pharmacists and technicians. Sweis estimated that about 80% of the pharmacy staff is diverse, with about 90% of that diverse group Middle Eastern and between thirty and forty-five Muslims. At the time of Mahran's employment, Branka Milicev, who is Yugoslavian Orthodox, was the clinical manager of the department, and Chris Boyle, a caucasian Christian, was the evening supervisor. Mahran knew Milicev was from Serbia and associated her with the genocide of Muslims in that country. Boyle could not discipline, hire, or fire employees, but Mahran did not have direct knowledge of this.

In connection with his hire, Mahran acknowledged receipt of Advocate's Associate Handbook in October 2013. The handbook provides that Advocate employees are to "treat all people with respect, integrity and dignity." Doc. 35 ¶ 16. It also includes information about Advocate's Equal Employment Opportunity policy, general and sexual harassment policy, non-

3

retaliation policy, and reporting mechanisms.  Advocate's conflict resolution program encouraged employees to engage in detailed discussions with other employees with whom a conflict existed, while also providing different avenues for resolution of conflicts, including focused approaches led by the human resources department, arbitration, and mediation.

Advocate has a corrective action policy that provides for progressive discipline, including level 1 and 2 warnings and a level 3 final warning.  Advocate could omit disciplinary steps depending on the seriousness and details of the infraction.  Additionally, a supervisor could give employees a performance deficiency notice ("PDN"), which identifies the employee's specific deficiencies, a corrective action plan, a time frame for demonstrating acceptable performance, and the consequences of failing to do so.

Advocate hired Mahran for an initial ninety-day probationary period.  His job required him to make certain decisions on his own, which Mahran testified encompassed verifying orders, including after a technician prepared them, providing recommendations to nurses and doctors, and adjusting medications for dose and frequency based on a patient's lab work.  Additionally, pharmacists at Advocate considered the appropriateness, safety, and efficacy of patients' drug therapy regimens and provided clinical expertise on pharmaceutical therapy.  Initially, Mahran worked both day and night shifts and rotated between the central pharmacy and hospital floors.

Mahran received approximately six weeks of training.  Milicev gave him reference material during his initial probationary period and also provided him with additional coaching and mentoring on more complicated orders.  Mahran had only three hours of training with the intensive care unit ("ICU") clinical coordinators.  Although he asked for two weeks of ICU training, as a non-ICU pharmacist, he did not require such specialized training.  During his training, two fellow pharmacists refused to answer Mahran's questions about policies and

procedures, and one shouted at him. Mahran reported these interactions to management as discriminatory in April 2014. Management spoke with these pharmacists and coached them to be more helpful and watch their tone.

On February 24, 2014, upon the conclusion of his probationary period, Brown-Scott evaluated Mahran, giving him an overall rating of meets expectations and the same in seven of eight categories. With respect to job accountabilities, Brown-Scott found that Mahran approached expectations, noting that he needed to develop his inpatient pharmacist skills to better oversee drug therapy at the hospital and that he had knowledge deficits arising from his limited exposure to inpatient staffing. She wanted Mahran to take an active role in learning more about the care of critically ill patients and those with a wide range of illnesses.

During Mahran's tenure as a registry pharmacist, Sweis hired two non-Muslim pharmacists, Barbara Bukowski and Dragica Radic, to full-time pharmacist positions on March 24, 2014. Bukowski and Radic had not worked registry at Advocate before being hired full-time, but Advocate did not require such a sequence. Bukowski had hospital experience from her internships and residency, and Radic worked in a hospital setting before Advocate hired her. Although Mahran believes Milicev favored Radic because they were both Serbian and somehow related, Milicev did not have any involvement in the hiring process. And Radic eventually lost her job for failure to comply with a PDN regarding behavioral and performance issues raised by Milicev's staff.

Mahran complained to Sweis about Bukowski's and Radic's hiring, telling her he would go to human resources and complain of racial discrimination if he did not get hired to a full-time position. Two days later, on April 20, 2014, Advocate hired Mahran as a full-time pharmacist.

Mahran then wrote to both Sweis and Milicev, expressing his thanks for their support and his appreciation for having them as his managers.

In his August 23, 2014 review, Brown-Scott rated Mahran as meeting expectations while noting that he should "have open and candid communications and handle difficult conversations with the appropriate party when necessary." Doc. 35 ¶ 38. After he received praise from Sweis on a presentation he gave in October 2014, Mahran thanked Sweis, Milicev, and Brown-Scott for their support and noted how they represented the meaning of "one for all&all for one." Doc. 35 ¶ 39. Mahran was disappointed in his April 2015 performance review, which found he met expectations, because he believed he should have received an overall rating of exceeds expectations.

On August 13, 2015, Mahran received a level 1 warning from Brown-Scott for verifying a discontinued order for a lung transplant patient without verifying another order for the same patient, and, instead of owning up to the mistake, stating that an Indian coworker did not act in a collaborative manner and so Mahran often responded similarly. Mahran disagreed with the warning and wrote to Sweis on September 19, indicating that he believed a misunderstanding occurred, he found it difficult to work with the involved coworker, and he was being scrutinized unfairly. Mahran claimed he did not intentionally leave the order but he needed to attend to other urgent orders and his coworker did not offer help. Having also received feedback about improperly switching his shifts, Mahran stated he would seek permission to do so and claimed Advocate had not previously required employees to obtain permission to move locations. Sweis acknowledged Mahran's frustration. Advocate management also followed up with the coworker involved in the August 2015 incident. That coworker resigned at the end of 2015 after being on a PDN for performance issues and cherry-picking orders.

In December 2015, one of Mahran's coworkers complained to management about the number of orders Mahran left him at the end of Mahran's shift.  Mahran disagreed and in response complained about the coworker, claiming he treated Muslims poorly and talked down to them.  Advocate investigated, learning from a Muslim pharmacist Mahran identified as also subjected to the coworker's racism that the other Muslim pharmacist had a good relationship with the coworker.  Advocate counseled, but did not discipline, Mahran and his coworker.

In April 2016, Brown-Scott gave Mahran a level 3 final warning for failing to verify a more complicated order after he received counseling in August 2015 and January 2016 regarding his selective verification and cherry-picking of orders, and in September 2015 for extensive switching of his schedule to allow him to avoid working in areas that required additional pharmacist work.  The switching compromised patient safety by delaying therapy or disproportionately distributing the workflow, and Milicev and Sweis had received numerous complaints about Mahran's switch requests.  Milicev and Sweis believed that Mahran thought that by switching out of the central pharmacy to certain hospital floors, he would have less complicated orders with the least acute patients.  Sweis also received complaints that Mahran took the easier orders for himself and left the more involved ones for others.  Management substantiated these complaints after examining its data.  Also in early April, Mahran received his annual performance evaluation, which this time found he only approached expectations overall, with a rating of meets expectations in five categories, approaching expectations in two, and not meeting expectations in one.

Mahran disagreed with the final warning and evaluation, writing on a notice he gave to human resources on April 8 that he believed he received them in retaliation for his reports of racial and religious discrimination and harassment.  On April 10, Mahran also emailed human

resources director, Jeremy Sadlier, and the vice president of human resources, Robin Fell, informing them of his belief that the evaluation and final warning were retaliation for reporting events that harmed patients, that he had been harassed by two colleagues, and that he experienced discrimination based on race, gender, and religious affiliation.  On April 25, human resources deleted the level 3 warning, with human resources consultant Caitlin Malito indicating the offending behavior was better addressed through a PDN, which Brown-Scott had issued on April 8.  The PDN indicated that Mahran's failure to consistently demonstrate the expected levels of performance and remedy the identified performance deficiencies within twelve months could lead to his termination.  Mahran refused to sign the PDN on April 11 because he disagreed with its substance.  The PDN had an initial feedback date of May 9, which Advocate extended, and follow-up meetings occurred on May 5, May 25, and June 18.

On May 4, Mahran again received a level 3 warning, this time for leaving the pharmacy before the relief pharmacist arrived and therefore failing to perform the proper hand-off to that pharmacist.  Sweis indicated such behavior could cause the hospital to lose its pharmacy license. In response, on May 7, Mahran sent a certified letter and email to Advocate's corporate human resources department in which he claimed the PDN and May 4 final warning stemmed from religious, racial, and ethnic prejudices.  He explained that, with respect to the incident that prompted the May 4 final warning, he had seen the relief pharmacist arriving, left the hand-off information on the computer, and told the lead technician he did so in case the pharmacist did not see the information.  Mahran met with Malito and Sweis to discuss the May 4 final warning on May 18.  Malito did not find evidence that Advocate had not followed any policies or procedures in connection with Mahran.

On May 22, Brown-Scott reminded Mahran to work his assigned shifts, including those requiring ICU order oversight, and asked Mahran to seek approval of any schedule change requests so as to ensure he did not remove himself from overseeing ICU orders. Mahran denied seeking to change shifts. Brown-Scott also reassigned Mahran a module on documenting medication histories that she thought would help him comply with the PDN. On June 9, Mahran told Malito that the situation in the pharmacy department was getting worse. Malito sought to schedule a conflict resolution session with Mahran and Sweis. After the session, Mahran learned that Sweis wanted to uphold the final warning. On June 21, Mahran indicated that he wished to proceed before an arbitration panel. Sadlier informed Mahran that a human resources employee would reach out to him to schedule an arbitration panel and that, with respect to Mahran's other complaints, the human resources and pharmacy departments had engaged in appropriate investigations.

Before the arbitration panel occurred, Advocate terminated Mahran on June 24 for failing his PDN. Neither Mahran nor the human resources department sought to schedule the arbitration after his termination. Mahran disagreed with Advocate's conclusion that he had not met the PDN requirements, believing instead that Advocate terminated him for complaining about harassment and discrimination. He does not know of Advocate putting anyone on a PDN who made similar complaints about discrimination. Advocate did terminate an African American night-shift pharmacist who did not verify critical orders and failed her PDN.

III.     **Alleged Evidence of Discrimination and Harassment**

    A.     **Inappropriate Comments**

Mahran complains about a number of inappropriate comments during his employment with Advocate. He learned that another Muslim pharmacist, Mohammed Judeh, heard another

pharmacy employee, Jonathan Murray, tell another pharmacist that he did not "go to marriage of brown people." Doc. 35 ¶ 87. Judeh told management he did not want to pursue the matter because Murray was leaving his full-time role. But Mahran thinks Advocate removed Judeh from working in the IV room after the incident. Mahran also complains that Sweis told him in August or September 2015 that although the way Mahran prioritized orders was "how you do it in Egypt," "[h]ere it's completely different." Doc. 35 ¶ 90. Mahran later reported Sweis to Malito for discriminatory conduct, but Malito dismissed his concerns, stating Sweis was "good; she's fine; we trust our managers." Doc. 35 ¶ 90. Mahran also claims that Brown-Scott told him that no discrimination occurred at Advocate Christ because she was African American. Mahran also learned from other Muslim pharmacists that an employee risked termination by complaining to human resources about any managers.

## B. Prayer Breaks

Mahran believes that while all employees received two fifteen-minute breaks and a thirty-minute break for lunch, Muslim pharmacy department employees could only take the meal break. He could not recall all of the breaks Muslim pharmacists took, however. Advocate pharmacy management claimed pharmacists should stagger their breaks and communicate with others about the timing of their breaks so that a certain number of people always covered the floors and central pharmacy. Advocate Christ has a number of places where individuals can pray, including a nondenominational chapel, a room available for employees, and a room available specifically on Fridays for Muslim prayer.

According to Mahran, in late 2015, Milicev told Khalil Alwatik to inform all Muslim pharmacists that they could not use their breaks for praying. Mahran did not witness the conversation or any other conversations with management regarding prayer breaks. In

December 2015, Sweis sent a message to Sadlier and Malito requesting a meeting to discuss prayer breaks and whether she could "tell [the Muslims in her department] to pray when they get home or they can only do so if it doesn't impact" the pharmacy department. Doc. 35 ¶ 97. Sweis said in her email that Milicev had learned at a legal class that they "are to respect and allow staff the time for prayers," but that to her, "patient care comes first." *Id.* Malito responded that employees could use their break and meal times as they desired but that to the extent leaving the pharmacy department had a negative impact on patient care, Advocate did not have to provide an accommodation.

Sweis, Milicev, Brown-Scott, and Malito never told Mahran he could not take prayer breaks, and he was not overtly disciplined for praying during a break. Once in 2016, however, Boyle prevented him from taking a prayer break and told him not to take further prayer breaks. Mahran received a later lunch break that day and prayed at that time. The day this occurred, only three of the usual four pharmacists were working the shift, and one of them took a meal break about five minutes after Mahran asked for a prayer break. Boyle also gave the other two pharmacists their two fifteen-minute breaks that day.

## C. Vacation Time

Although Islam does not prohibit Mahran from working during Ramadan or Eid, he applied for dates off during these holidays and indicated his request was for religious reasons. In 2015, Eid fell on July 17 and September 24, and Mahran had off from July 13 through July 20 and September 24. Sweis acknowledged Eid that year and wished Muslim pharmacists a happy holiday on July 17. In 2016, several Muslim pharmacists had scheduled paid time off during Eid. Before his termination, Mahran had requested and been denied paid time off on Eid, which fell on July 6, 2016, because more than three people already had that day off. Mahran also

11

applied for time off from June 29 to July 3, 2016 for Ramadan. Sweis informed Mahran on June 18 that she could not put through all his requests for time off because Advocate had already approved four people for leave during that time. Sweis told Mahran he could work with other pharmacists to find coverage for those days if he did not want to work. Mahran thanked Sweis for her quick response.

Mahran believes managers overrode the limit of pharmacists off on a specific day for non-Muslim pharmacists, but he could not point to any examples of such overrides. Mahran complains that another pharmacist, Kati Khouri, had eighteen days off in June 2016. But Sweis stated this was due to Khouri getting married that month and switching with others for some of these days off. Additionally, when pharmacists began bidding for 2016 vacation time based on seniority in November 2015, Mahran believed that management placed individuals with less seniority before him. Advocate admits it placed Khouri ahead of Mahran but claims it did so because it included her time at Advocate as a pharmacy resident in determining seniority.

### D.     Pay

Advocate paid Mahran on a bi-weekly basis based on his annualized salary and did not make deductions based on the quantity or quality of his work. Upon becoming a full-time pharmacist, Mahran's hourly pay rate changed from $51.75, the registry rate, to $50. Although Mahran heard from other pharmacists that Bukowski and Radic started at $52.50 per hour, Advocate's records indicate they both started at $50 per hour. Mahran complained to Sweis about his starting full-time pharmacist salary. Sweis followed up with human resources in late June 2014 about the starting rates for pharmacists with one year of experience and asked for an increase to Mahran's salary. In August, Sweis informed Mahran that Advocate increased his

hourly rate to $51.75 from $50, which was higher than the starting rates for pharmacists with one year of experience. Advocate made the change retroactive to his full-time hire date.

In connection with his 2015 performance review, effective April 20, 2015, Mahran received a merit increase to $53.0438 per hour. In March 2016, Mahran asked both Brown-Scott and Sweis whether Advocate could adjust his salary given his experience and MBA. Sweis told him the salaries did not account for additional degrees and that merit increases occurred yearly. Mahran appeared satisfied with the response. At some point, Mahran learned from fellow pharmacists, including two Muslim pharmacists, that they received bonus pay for additional hours they worked. But this additional pay went into effect after Mahran's termination to incentivize pharmacists to take additional shifts when the pharmacy was short-staffed.

## IV.    Discrimination Charges

On May 6, 2016, Mahran filed a discrimination charge with the Illinois Department of Human Rights ("IDHR"), claiming discrimination on the basis of race, religion, and national origin. The IDHR issued a right to sue letter on May 9, 2017, while the Equal Employment Opportunity Commission ("EEOC") dismissed the charge on December 21, 2017. Mahran filed a second charge with the IDHR on July 19, 2016, alleging retaliation and discrimination based on race, religion, and national origin. The IDHR issued a right to sue letter on the second charge, which Mahran received on or about May 30, 2017. He filed this suit on August 7, 2017.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and

affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party

seeking summary judgment bears the initial burden of proving that no genuine issue of material

fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265

(1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the

evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue

for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a

bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v.*

*Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light

most favorable to the non-moving party and draw all reasonable inferences in that party's favor.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## ANALYSIS

### I.   Exhaustion of Title VII Claims

First, Advocate argues that Mahran did not properly exhaust his Title VII claims because

he filed suit before he received a right to sue notice from the EEOC. "[A]n employee must

obtain a right-to-sue letter before bringing suit—and a court will typically insist on satisfaction

of that condition." *Mach Mining, LLC v. E.E.O.C.*, --- U.S. ----, 135 S. Ct. 1645, 1651, 191 L.

Ed. 2d 607 (2015). But receipt of a right to sue notice "is not a jurisdictional prerequisite to

bringing a Title VII suit." *Worth v. Tyer*, 276 F.3d 249, 259 (7th Cir. 2001). Instead, the lack of

a right to sue letter serves as a defense to a Title VII claim, *id.*, and the receipt of a right to sue

notice after the filing of the complaint cures any deficiency and defeats this defense, *Perkins v.*

*Silverstein*, 939 F.2d 463, 471 (7th Cir. 1991). Here, Mahran received right to sue notices from

the EEOC after he filed his complaint, curing any deficiencies. *See Burgett v. U.S. Dep't of*

*Treasury*, 603 F. Supp. 2d 1152, 1156 (N.D. Ill. 2009) (subsequent filing of administrative

14

agency decision perfected administrative exhaustion); *Sherman v. Standard Rate Data Serv., Inc.*, 709 F. Supp. 1433, 1437 (N.D. Ill. 1989) (equitable principles justify modifying Title VII's statutory filing prerequisite where, for example, the plaintiff has received a right to sue letter after filing the case and the case remains pending). Therefore, the Court may consider the merits of Mahran's Title VII claims.[3]

## II. Hostile Work Environment Claims (Counts I, II, VI, and VII)

To establish a hostile work environment under Title VII, Section 1981, and the IHRA, Mahran must provide evidence that: (1) he was subject to unwelcome harassment, (2) the harassment was based on a protected characteristic, (3) the harassment was so severe or pervasive that it altered the conditions of his employment and created a hostile or abusive work environment, and (4) a basis exists for employer liability. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018); *see Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) (noting that the same framework applies to Title VII and IHRA claims); *Lane v. Riverview Hosp.*, 835 F.3d 691, 695 (7th Cir. 2016) (analyzing Title VII and § 1981 claims under the same framework). The Seventh Circuit has alternatively looked for evidence that the workplace was subjectively and objectively offensive, in place of the first and third prongs, but ultimately the inquiry remains the same. *Johnson*, 892 F.3d at 900. Mahran raises claims of a hostile work environment with respect to race, national origin, and religion.

Advocate argues that Mahran cannot demonstrate an objectively offensive work environment. In evaluating Mahran's claim, the Court must consider the totality of the

---

[3] In a footnote, Advocate also argues that many of Mahran's complaints are time-barred because they occurred over 180 days before his May 6, 2016 charge. But the Court does not address this undeveloped argument. *See Harmon v. Gordon*, 712 F.3d 1044, 1053 (7th Cir. 2013) ("[A] party can waive an argument by presenting it only in an undeveloped footnote."); *Schrock v. Learning Curve Int'l, Inc.*, 744 F. Supp. 2d 768, 770 n.1 (N.D. Ill. 2010) ("Undeveloped arguments and arguments raised in footnotes are waived.").

15

circumstances. *Hall v. City of Chicago*, 713 F.3d 325, 331 (7th Cir. 2013). It looks at a number of factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance." *Ezell v. Potter*, 400 F.3d 1041, 1047 (7th Cir. 2005) (citing *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 806–07 (7th Cir. 2000)). Vague and conclusory allegations about hostile conditions, without specific support in the record, do not allow a plaintiff to survive summary judgment. *Hoosier v. Greenwood Hosp. Mgmt. LLC*, 32 F. Supp. 3d 966, 979–80 (N.D. Ill. 2014). The law "does not prohibit all verbal or physical harassment in the workplace," *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 80, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998), and courts have found that "[o]ffhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment," *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840–41 (7th Cir. 2009). The parties address two forms of alleged conduct in relation to their analysis of the hostile work environment claims: (1) offensive comments, and (2) disparate treatment in the form of denial of adequate training, equal pay, and vacation time. The Court finds it more appropriate to address the alleged adverse employment actions separately under a disparate treatment analysis and so considers only the allegedly offensive comments here.

Mahran complains of comments made to him or that he overheard while working at Advocate, contending that they show hostility toward Egyptians and Muslims. "Courts should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive," but instead should "look at the totality of the circumstances." *Hall*, 713 F.3d at 331 (quoting *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1045 (7th Cir. 2000)). Mahran has introduced evidence of the following comments:

16

(1) Brown-Scott told him in 2014 that racial discrimination did not exist on the job because she was African American; (2) Sweis told him in 2015 that orders were prioritized differently at Advocate than in Egypt; (3) when he spoke with Malito about his belief that Sweis was racist, she responded by dismissing his statement and indicating that "she's fine; we trust our managers," Doc. 35 ¶ 92; (4) a Muslim pharmacist overheard an associate telling another pharmacist that he did not attend the marriages of "brown people," *id.* ¶ 87; (5) Dorsey talked down to Muslims; (6) another pharmacist told Mahran in 2015 that Milicev asked him to pass along the message that Muslim pharmacists could not pray or take prayer breaks; and (7) Boyle told him in March 2016 that he could not take a prayer break.

Considering all these statements together, the Court cannot conclude that Mahran's work environment was so objectionable to rise to an actionable level. *See Ngeunjuntr v. Metro. Life Ins. Co.*, 146 F.3d 464, 467 (7th Cir. 1998) (rejecting claim of offensive environment based on comments that, while offensive, were isolated and in some circumstances not directed at plaintiff). "A handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage." *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431 (7th Cir. 1995). And that is all Mahran presents here, singling out several comments over the course of his employment with Advocate.

Of those comments, what others told Mahran someone else said amounts to inadmissible hearsay. *See Flanagan v. Office of Chief Judge of Circuit Court of Cook County, Ill.*, 893 F.3d 372, 375 (7th Cir. 2018) (finding court properly excluded statements about what colleague told plaintiff others said because they suffered from a double hearsay problem). *But see Johnson*, 892 F.3d at 903 (noting that comments made to others about which the plaintiffs heard were in some cases double hearsay but could potentially be admitted as evidence "of the fact that

employees understood their environment to be one in which derogatory statements were pervasive"). Although Mahran complains generally about Dorsey's language to Muslims, he does not provide any specific examples to allow the Court to evaluate Dorsey's actions and their effect on others. *See Porter v. City of Chicago*, 700 F.3d 944, 956 (7th Cir. 2012) (finding that, without additional detail, a plaintiff's "vague and conclusory allegations of being 'harassed' and 'intimidated' by her supervisors" would not allow a reasonable jury to find objectively offensive, severe, or pervasive conduct). Taken in the context of providing Mahran feedback, Sweis' comment aims to explain differences in procedures arising from territorial and training differences. *See Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 720 (7th Cir. 2018) (finding statements "innocuous when viewed in context"); *Doe v. Univ. of Chicago*, No. 16 C 08298, 2017 WL 4163960, at *8 (N.D. Ill. Sept. 20, 2017) ("Context is crucial, and the ultimate question is whether the object of the harassment was treated differently *because of [the protected characteristic]*."). And as Mahran admits, Boyle's comments did not keep Mahran from praying because he could pray during his lunch break. While some of the allegedly offensive remarks came from Mahran's supervisors, this alone does not allow for a finding of an objectively offensive environment. *Cf. Gates v. Bd. of Educ. of the City of Chicago*, --- F.3d ----, 2019 WL 698000, at *6 (7th Cir. Feb. 20, 2019) ("[W]hen the harassment involves such appalling racist language [such as the use of the N-word on at least two occasions] in comments made directly to employees by their supervisors, we have not affirmed summary judgment for employers.").

At most, Mahran has shown the environment at Advocate was at times inappropriate and offensive, not that it rose to the level of severity and pervasiveness found actionable by the Seventh Circuit, particularly where Mahran has presented no evidence that the comments interfered with his work. *See Swyear v. Fare Foods Corp.*, 911 F.3d 874, 882 (7th Cir. 2018)

18

("Scott certainly crossed far beyond the line of acceptable workplace etiquette, but his actions were not as offensive as this Court has required to constitute a hostile or abusive work environment."); *Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002) (finding eight offensive gender-based comments over multiple years, including ones made directly to plaintiff and others plaintiff only learned of from others, did not support a finding of severe or pervasive harassment); *Kawczynski v. F.E. Moran, Inc.*, 238 F. Supp. 3d 1076, 1086–87 (N.D. Ill. 2017) (finding that relatively pervasive name calling that hurt plaintiff's feelings and affected him emotionally but did not interfere with his work did not amount to a hostile work environment); *Basheeruddin v. Advocate Health & Hosps. Corp.*, No. 15-cv-4131, 2016 WL 3520160, at *4 (N.D. Ill. June 27, 2016) (concluding that three or four sporadic comments and incidents directed at Muslim plaintiff did not rise to the level of a hostile work environment). Because Mahran has not created an issue of fact on this element of his claim, the Court grants summary judgment to Advocate on Mahran's hostile work environment claims.[4]

## III. Disparate Treatment Claims (Counts IV, V, VI, and VII)

Mahran claims Advocate denied him training, equal pay, promotions, and vacation time in violation of Title VII, § 1981, and the IHRA.[5] Mahran also raises discriminatory discipline and termination claims.[6] Courts previously spoke of proceeding under an indirect or direct

---

[4] Because the Court finds Mahran cannot establish an objectively offensive work environment, or, in other words, that the conduct was severe or pervasive, the Court need not address Advocate's other arguments that the harassment was not based on race, national origin, ethnicity, or religion, or that no basis exists to impose employer liability.

[5] Advocate treated Mahran's allegations of disparate treatment in violation of § 1981 as supporting a hostile work environment claim. Although this is how Mahran labeled his § 1981 claims in the complaint, the Court finds it more appropriate to address these allegations in connection with Mahran's disparate treatment claims under Title VII and the IHRA.

[6] Additionally, Mahran's response to Advocate's summary judgment motion refers to the denial of breaks to Muslim pharmacists to pray. But the Court cannot determine whether he pursues a claim for Advocate's failure to provide a reasonable accommodation with respect to such prayer breaks. Advocate

method to establish discrimination, but the Seventh Circuit has instructed that instead of using such tests, the Court should consider the evidence "as a whole" to determine whether it "would permit a reasonable factfinder to conclude that the plaintiff's [race, religion, or national origin] caused the [adverse employment action]." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The Court must determine "whether a reasonable factfinder could 'conclude that [Mahran's] proscribed factor caused the [adverse employment action].'" *Brown v. DS Servs. of Am., Inc.*, 246 F. Supp. 3d 1206, 1216 (N.D. Ill. 2017) (quoting *Ortiz*, 834 F.3d at 765). This does not mean, however, that the Court cannot consider the traditional burden-shifting test laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), under which Mahran attempts to demonstrate that he has the evidence needed to survive summary judgment. *Ortiz*, 834 F.3d at 766 (noting that its decision does not overrule *McDonnell Douglas*). The Court considers the evidence through the *McDonnell Douglas* framework and then turns to a cumulative review of the evidence to determine whether a reasonable factfinder could determine that Mahran's religion or national origin caused the complained-of adverse actions. *See David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). First, however, because Advocate challenges whether certain of Mahran's claimed employment actions qualify as materially adverse, an inquiry vital to both inquiries, the Court addresses the scope of Mahran's discrimination claims.

---

does not address the denial of prayer breaks in its opening memorandum or reply, and Mahran does not provide any legal authority or argument in support of such a claim. Therefore, the Court does not have developed arguments as to whether such a claim should survive summary judgment. *See Porter*, 700 F.3d at 951 (setting forth the elements of a case of religious discrimination based on an employer's failure to provide a reasonable accommodation). To the extent Mahran seeks to pursue this aspect of his religious discrimination claim, the Court leaves the issue open for further briefing or, alternatively, trial.

### A.    Adverse Employment Action

A materially adverse employment action is an action that involves "a significant change in employment status," *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) (quoting *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 235 (7th Cir. 2014)), and is "more disruptive than a mere inconvenience or an alteration of job responsibilities," *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 779 (7th Cir. 2007) (quoting *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004)).  Adverse employment actions generally fall into three categories: "(1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge."  *Barton v. Zimmer, Inc.*, 662 F.3d 448, 453–454 (7th Cir. 2011).  Advocate argues that Mahran's claims of denial of training and vacation and his negative reviews and subsequent discipline do not rise to the level of adverse employment actions.

### 1.    Denial of Training

First, Mahran claims that he did not receive the same amount of training on ICU procedures as non-Muslim pharmacists, with only three instead of forty hours of such training. Mahran does not provide any support that general pharmacists employed by Advocate, like himself, received forty hours of ICU training.  Instead, the record indicates that Advocate did not provide specialized additional training to these general pharmacists.  Advocate instead provided them with some exposure to the ICU clinical care coordinators and other specialty areas, without any specified hours of training in these specialty areas.  Although Mahran may have liked to receive more ICU training, he has not established that the failure to receive specialized training,

not ordinarily provided to those in his position, amounts to an adverse employment action. *See Williams v. City of Chicago*, No. 16-cv-8271, 2017 WL 3169065, at *4 (N.D. Ill. July 26, 2017) (finding that denial of training did not rise to the level of an adverse employment action). Mahran has not shown that he suffered any material harm from his receiving only three hours of ICU training. *See Traylor v. Brown*, 295 F.3d 783, 788–89 (7th Cir. 2002) (noting that because "not everything that makes an employee unhappy will suffice to meet the adverse action requirement," the employee "must show that material harm has resulted from . . . the challenged actions" (alteration in original) (citations omitted) (internal quotation marks omitted). Because the failure to receive additional ICU training does not amount to an adverse employment action, Mahran cannot proceed on this aspect of his discrimination claims.

### 2. Vacation Requests

Next, Mahran complains that Advocate denied his requests for vacation time during Ramadan. But the refusal to honor an employee's preferred vacation schedule amounts to merely an inconvenience and does not materially alter the terms and conditions of the employee's job. *See Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004) (finding that refusal to approve annual leave requests and shift changes did not amount to adverse employment actions); *Sraieb v. Am. Airlines, Inc.*, 735 F. Supp. 2d 837, 843 (N.D. Ill. 2010) (finding that employer's denial of a request for a ground assignment during Ramadan did not amount to an adverse employment action). Because it does not qualify as an adverse employment action, Mahran cannot recover for discrimination based on the denial of his requested vacation time.

### 3. Negative Reviews and Discipline

Finally, Advocate claims that Mahran cannot establish an adverse employment action based on his receipt of negative evaluations and placement on a PDN. "[U]nfair reprimands or

negative performance evaluations, unaccompanied by some tangible job consequence, do not constitute adverse employment actions." *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 729 (7th Cir. 2001); *see also Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 889 (7th Cir. 2016) (concluding that placement on performance improvement plan on its own did not rise to level of adverse employment action). Mahran responds that he suffered tangible job consequences because Advocate ultimately terminated him for failing to meet the PDN. Although the negative performance reviews and placement on a PDN "brought [Mahran] closer to termination[,] [s]uch a course was not an inevitable consequence of every reprimand." *Oest v. Ill. Dep't of Corrs.*, 240 F.3d 605, 613 (7th Cir. 2001), *overruled on other grounds by Ortiz*, 834 F.3d 760. Because Mahran has not "pointed to any immediate consequence of the reprimands, such as ineligibility for job benefits like promotion, transfer to a favorable location, or an advantageous increase in responsibilities," his receipt of negative evaluations and placement on a PDN do not amount to adverse employment actions. *Id.* Therefore, Mahran cannot rely on these actions as separate examples of discrimination, although they remain relevant evidence to a determination of whether Advocate's decision to terminate Mahran's employment was discriminatory. *Id.*

### B. *McDonnell Douglas*

*McDonnell Douglas* allows a plaintiff to establish a *prima facie* case of discrimination and then rebut a defendant's stated non-discriminatory reason for the termination. *David*, 846 F.3d at 225. Mahran may establish a *prima facie* case by presenting facts that (1) he belongs to a protected class, (2) he was meeting Advocate's legitimate expectations, (3) he suffered an adverse employment action, and (4) Advocate treated similarly situated employees outside of his protected group more favorably. *Id.*; *Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 453–54 (7th Cir. 2009). If Mahran does this, then Advocate "must articulate a legitimate,

23

nondiscriminatory reason" for taking the adverse employment actions, "at which point the burden shifts back" to Mahran to submit evidence showing Advocate's reason is pretextual. *Brown*, 246 F. Supp. 3d at 1217.

### 1. Promotion to Full-Time Position

In considering a failure to promote claim under *McDonnell Douglas*, the Seventh Circuit has indicated that the plaintiff must show "he applied, was qualified, and was rejected for the position sought," and also that "the employer granted the promotion to someone outside of the protected group who was not better qualified than the plaintiff." *Carter v. Chicago State Univ.*, 778 F.3d 651, 660 (7th Cir. 2015) (quoting *Grayson v. City of Chicago*, 317 F.3d 745, 748 (7th Cir. 2003)). Mahran complains that he only received a promotion from registry to full-time pharmacist after threatening to inform Advocate's human resources department of the perceived discrimination arising from Advocate hiring two others, Bukowski and Radic, to full-time positions before elevating him to full-time status.[7] Mahran, however, does not provide any evidence that he had applied for a full-time position when Advocate hired these other pharmacists. *See Jaburek v. Foxx*, 813 F.3d 626, 631 (7th Cir. 2016) (noting that a failure to promote claim requires evidence that the plaintiff applied for the position at issue). Mahran

---

[7] Advocate does not argue that the delay in Mahran's promotion to full-time pharmacist, or the failure to promote him to open positions that Bukowski and Radic filled, does not amount to an adverse employment action. *See Cullom v. Brown*, 209 F.3d 1035, 1042 (7th Cir. 2000) ("[B]ecause a failure to promote affects the rate of pay and the accrual of leave, denying Cullom an earlier promotion was not only adverse, it was materially adverse."). The Court questions, however, whether the length of the delay here would qualify as an adverse employment action, but neither side has argued this point. Mahran experienced only a one-month delay between the hiring of Bukowski and Radic on March 24, 2014, and his promotion to a full-time position on April 20, 2014. The Seventh Circuit has found that a two-month wait between the time a plaintiff applied for and received a promotion does not qualify as an adverse employment action. *See Bannon v. Univ. of Chicago*, 503 F.3d 623, 628 (7th Cir. 2007) ("Employees cannot expect to be promoted the instant they apply. Some lag time has to be allowed for the application to work its way through the administrative process"); *Bennett v. Potter*, No. 09 C 2276, 2011 WL 1231166, at *9 (N.D. Ill. Mar. 30, 2011) (refusing to find delay amounted to adverse employment action where plaintiff did not offer evidence of length of delay or suggest that delay extended longer than two months).

could alternatively prevail if he demonstrated that Advocate's discriminatory practices deterred him from applying. *See Khan v. First Am. Title Co.*, No. 16 C 9493, 2018 WL 4333626, at *4 (N.D. Ill. Sept. 11, 2018). But Mahran similarly does not present any such evidence. Therefore, his *prima facie* claim for failure to promote fails.

### 2. Pay Disparities

Mahran complains that he received a lower rate of pay than other pharmacists employed by Advocate during his tenure. But Mahran's *prima facie* case regarding pay discrimination fails because he has not sufficiently identified similarly situated employees outside of his protected class. "Similarly situated employees 'must be directly comparable to the plaintiff in all material respects,' but need not be identical in every conceivable way." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012). Typically, a plaintiff must at least show that the comparators "(1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 847. Although Mahran has presented records detailing other pharmacists' wages, he has done nothing more to allow the Court to make the proper comparison. The records identify the pharmacists' race, but not their national origin or religion. Nor has Mahran presented these pharmacists' qualifications aside from listing their hire date. Mahran even acknowledges he does not know how his qualifications compared to the other pharmacists, dooming his attempt to rely on these individuals as comparators. *See Boss*, 816 F.3d at 919 (noting that speculation about comparators' work histories does not suffice to show similarly situated employees); *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008) (concluding that plaintiff's limited information on comparators was "too vague to allow this Court to determine whether Gates and the men are 'similarly situated' ").

Mahran also complains he did not receive overtime pay for additional hours he worked, despite hearing from other pharmacists that they received such pay. Although Mahran testified that he heard from others that they received this pay, such testimony consists of inadmissible hearsay. He does not provide any admissible evidence to support the contention that others received overtime pay while he remained in Advocate's employ, and Mahran's claim in his response that he learned of the overtime pay while still working finds no support in the record. Instead, the only admissible evidence indicates that the additional payments formed part of an incentive program to encourage pharmacists to work extra shifts when the pharmacy was short-staffed and began after Mahran's termination.[8] Therefore, the Court finds Mahran cannot prevail on his pay discrimination claim using the *McDonnell Douglas* framework.

### 3. Termination

Finally, the Court addresses Mahran's claim that Advocate discriminated against him in terminating his employment. Advocate argues that Mahran was not meeting its legitimate expectations, focusing on the identified performance issues that led to his termination. Significant overlap exists between the legitimate expectations prong of Mahran's *prima facie* case and the pretext question because Advocate asserts that it terminated Mahran for failure to comply with the PDN. *See Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 477–78 (7th Cir. 2010) ("When the employer asserts as the nondiscriminatory reason for termination that the employee was not meeting legitimate job expectations, the credibility of the employer's assertion is at issue for both the second element of the plaintiff's *prima facie* case and the pretext analysis."); *Senske v. Sybase*, 588 F.3d 501, 507 (7th Cir. 2009) (when the employee argues that the employer is "lying about its legitimate employment expectations in order to set up a false

---

[8] Mahran does point to testimony from Brown-Scott that an employee could receive additional pay for working extra shifts. But Mahran does not present any concrete evidence of additional shifts he worked for which he did not get paid, so Brown-Scott's testimony does not advance his cause.

rationale for terminating him . . . the question of whether he was meeting [the employer's] legitimate expectations merges with the question of whether [the employer's] reasons for firing [the employee] are pretextual").  Thus, the Court combines its analysis of these questions.

Mahran received satisfactory evaluations in 2014 and 2015, although the evaluations also noted areas in which he needed improvement.  In August 2015, he received a Level 1 warning for verifying a discontinued order and failing to verify the next order for the same patient. Instead of accepting the criticism, he blamed a coworker and complained about the additional scrutiny.  He also received counseling in December 2015 based on another pharmacist's complaint that Mahran had left an inordinate number of orders for the incoming shift.  This did not amount to formal discipline, and the other pharmacist also received counseling.  In April 2016, Mahran received a Level 3 warning for failing to verify a more complicated order, selective verification of orders, extensive switches to avoid working in areas that needed additional work, and compromising patient safety by delaying therapy and causing the disproportionate distribution of workflows.  Mahran received an overall rating of approaching expectations in his April 2016 performance review, lower than prior reviews.  Although human resources deleted the Level 3 warning after Mahran complained, this was because it determined the conduct was better addressed through a PDN, on which Brown-Scott had already placed Mahran.  The PDN covered Mahran's failure to properly verify orders and cherry-picking of the orders he did process based on their complexity.  It also addressed the need to deal with problems and issues directly instead of avoiding conflict and difficult conversations with his coworkers and to accept more responsibility for his assigned duties and help other pharmacists as needed.  The PDN indicated that failure to consistently demonstrate the expected levels of performance could lead to his termination.  Advocate's management evaluated Mahran's

compliance with the PDN on several occasions, finding he only demonstrated progress during one evaluation period and otherwise continued to perform below the level of expected performance. Mahran also received a Level 3 final warning on May 4 for leaving the pharmacy before the relief pharmacist arrived and performing a handoff to that pharmacist.

Based on the April 2016 performance review, the PDN and its subsequent evaluations, and the Level 3 warning Mahran received in May 2016, the Court cannot conclude that Mahran was meeting Advocate's legitimate expectations at the time of his termination or that Advocate provided a pretextual reason for his termination. His earlier satisfactory performance reviews do not create a question of fact on these issues. *See Lauth v. Covance, Inc.*, 863 F.3d 708, 715 (7th Cir. 2017) (finding that evidence presented demonstrated that the employer was clearly not satisfied with the plaintiff's job performance, notwithstanding the positive ratings he received on his year end performance reviews); *Fortier v. Ameritech Mobile Commc'ns*, 161 F.3d 1106, 1113 (7th Cir. 1998) ("[E]arlier evaluations cannot, by themselves, demonstrate the adequacy of performance at the crucial time when the employment action is taken."). Mahran's contrary belief that he was performing his job adequately also does not affect the analysis because the Court instead considers the employer's belief. *See Lauth*, 863 F.3d at 715–16 ("Lauth's belief that he was performing his job adequately is not relevant to the question of whether Covance believed it had a legitimate, non-discriminatory basis to terminate him."); *Mirocha v. Palos Cmty. Hosp.*, 240 F. Supp. 3d 822, 839 (N.D. Ill. 2017) (finding plaintiff could not create an issue of fact by claiming he was performing adequately or challenging his supervisors' assessment of his performance). Because the evidence demonstrates that Mahran did not meet Advocate's legitimate expectations—continuing to cherry-pick orders, failing to communicate with his supervisors, and failing to take responsibility during his shift and assist others—the

28

Court finds that Mahran cannot meet this element of his *prima facie* case with respect to his termination.

Similarly, "[p]retext requires more than showing that the decision was mistaken, ill considered or foolish, and so long as the employer honestly believes those reasons, pretext has not been shown." *Formella v. Brennan*, 817 F.3d 503, 513 (7th Cir. 2016) (citation omitted). He can "demonstrate pretext directly by showing that 'a discriminatory reason more likely motivated' his termination, or indirectly by showing that [Advocate's] explanations are 'unworthy of credence.'" *Senske*, 588 F.3d at 507 (citation omitted). In determining whether an employer's explanation is honest, courts look to the reasonableness of the explanation. *Duncan v. Fleetwood Motor Homes of Ind., Inc.*, 518 F.3d 486, 492 (7th Cir. 2008); *see also Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise or well-considered.").

Although Mahran may believe that Advocate applied discipline unevenly and that his actions did not warrant termination, the Court does not sit as a "super personnel department that second-guesses employer's business judgments." *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1181 (7th Cir. 2002) (citation omitted) (internal quotation marks omitted); *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 464 (7th Cir. 2014) ("This court has repeatedly stated that it is not a super-personnel department that second-guesses employer policies that are facially legitimate. . . . A court cannot interfere because an employer's decision is unwise or unfair."). He presents no evidence that would create a question of fact as to whether Advocate provided a pretextual reason to terminate Mahran. *Widmar*, 772 F.3d at 465 (finding employee failed to show pretext where he only offered speculation instead of identifying inconsistencies in employer's reasons for termination). The June 10, 2016 email from a vice president of human resources on which

29

Mahran relies to show pretext states that it "[d]oesn't sound like his PDN will be completed successfully and he will be exiting the organization." Ex. 67 to Pl.'s Resp. Without additional context, this email merely parrots the basis for his termination—the failure to successfully complete his PDN—and does not suggest that Advocate did not honestly believe its given reason for Mahran's termination. While the Advocate employee made this statement over a week before his termination, the interim reports of his compliance with the PDN support her evaluation. Because no evidence exists to question Advocate's decision to terminate Mahran for failure to comply with the PDN, Mahran also cannot establish that Advocate's reason for terminating him amounts to pretext. Therefore, Mahran's termination claim fails under *McDonnell Douglas*.[9]

### C. Cumulative Assessment of the Evidence

"A district court must not limit its analysis to *McDonnell Douglas* or treat some evidence as relevant to the *McDonnell Douglas* analysis but not to the broader question whether 'a reasonable factfinder [could] conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the [adverse employment action.]'" *Zegarra v. John Crane, Inc.*, 218 F. Supp. 3d 655, 665–66 (N.D. Ill. 2016) (alteration in original) (quoting *Ortiz*, 834 F.3d at 765). Instead, it must also weigh whether Mahran's evidence would cause "a reasonable factfinder to determine" that his race, national origin, or religion caused delay in his promotion to full-time pharmacist, any pay disparities, or his termination. *Aberman v. Bd. of Educ. of City of Chicago*, No. 12-cv-10181, 2017 WL 1036487, at *10, 13 (N.D. Ill. Mar. 17, 2017) (after addressing *McDonnell Douglas* test, cumulatively assessing "all the evidence" to determine if the plaintiff

---

[9] Mahran also does not identify any similarly situated comparators who Advocate placed on a PDN and did not ultimately terminate. Instead, the Court only has before it evidence concerning three employees, none of whom are Egyptian, Middle Eastern, or Muslim, who Advocate terminated or who resigned after they failed to comply with a PDN. Advocate had placed one of these individuals on a PDN for, among other things, cherry-picking orders and terminated another for failing to verify critical orders.

could prove a case of age and disability discrimination at trial).  "[A]ssessing cumulatively all the record evidence without the assistance of the *McDonnell Douglas* paradigm," *David*, 846 F.3d at 227, a reasonable jury could not conclude that Advocate committed the adverse employment actions because of Mahran's race, national origin, or religion.

Considering first the delay in Mahran's promotion, the evidence indicates that Mahran's probationary period ended in February 2014 and he complained that Advocate had hired others to full-time pharmacist positions in April 2014, after which Advocate hired him to the position. Although Mahran had asked about switching to a full-time position prior to his probationary period ending, the Court does not have before it any evidence suggesting he requested such a switch after his probation ended.  That Advocate hired two non-Muslim full-time pharmacists prior to promoting him to this position, without more, does not allow for an inference of discrimination.  Nor can the Court infer discrimination from the fact that neither of these individuals had previously worked for Advocate in registry, which Mahran admits in his response was merely the stated preferred route for pharmacists at Advocate.  Moreover, the Court does not have sufficient facts before it to understand Advocate's hiring and promotion process, including, for example, whether Advocate had sought to fill the two full-time positions before Mahran's probationary period ended, the other individuals' qualifications, and Advocate's decisionmaking process.  *See Terry v. Gary Cmty. Sch. Corp.*, 910 F.3d 1000, 1006 (7th Cir. 2018) (rejecting failure to promote claim where court did not have information about how the employer sought to fill vacant positions).  Instead, the Court merely has Mahran's belief that discrimination motivated these actions, but this "unsubstantiated belief cannot overcome summary judgment." *Davis v. Ford Motor Co.*, --- F. App'x ----, 2019 WL 548611, at *1 (7th Cir. Feb. 12, 2019).

As for his pay discrimination claims, as discussed above, the evidence Mahran supplies does not include sufficient information to allow an inference of discrimination, failing to differentiate between the relevant protected characteristics of the individuals and also showing a wide range in pay even among individuals hired by Advocate in the same year and of the same race.  Mahran received a pay increase in 2014, which Sweis pursued on his behalf.  Although the record does not include any written policy to support Advocate's salary policies, the evidence the Court has before it about how Advocate determined salaries does not allow the Court to conclude that any pay disparities resulted from animus based on race, national origin, or religion.  Similarly, nothing suggests that Advocate denied Mahran overtime pay based on his protected characteristics, with the evidence instead showing that two of the pharmacists Mahran claims received overtime pay are Muslim.

Finally, the evidence related to Advocate's decision to terminate Mahran does not suggest discrimination, particularly in light of Advocate's legitimate, non-discriminatory concerns about Mahran's performance as a pharmacist.  Although Mahran attempts to show discriminatory animus through his supervisors' comments and inquiries about Muslims taking prayer breaks, he fails to connect this potential religious animus to his termination based on documented performance concerns.  The Court therefore finds that Mahran has failed to create an issue of fact on the discrimination claims addressed here.

## IV.    Retaliation Claims (Counts III and VIII)

Mahran raises retaliation claims under Title VII and the IHRA based on his informal complaints of harassment since 2013 and his May 6, 2016 IDHR charge.  To succeed on his retaliation claims, Mahran must establish that (1) he engaged in statutorily protected activity, (2) he suffered an adverse employment action, and (3) a causal link exists between his protected

32

activity and the adverse action. *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016); *see Zaderaka v. Ill. Human Rights Comm'n*, 545 N.E.2d 684, 687, 131 Ill. 2d 172, 137 Ill. Dec. 31 (1989) (noting that courts use the same analytical framework to analyze Title VII and IHRA claims). Under Title VII, Mahran must show but-for causation, meaning "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013); *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017). At least one court in this district has noted that IHRA retaliation claims similarly require but-for causation. *Holladay v. CME Grp.*, No. 11 cv 8226, 2014 WL 4358362, at *5 (N.D. Ill. Sept. 3, 2014).

Mahran appears to argue that Advocate retaliated against him by giving him a lower performance review in April 2016, placing him on a PDN in April 2016, giving him corrective action in April and May 2016, and terminating him from his position as a pharmacist.[10] The standard for showing an adverse employment action for a retaliation claim is lower than that for a discrimination claim. *See Chaib v. Indiana*, 744 F.3d 974, 986–87 (7th Cir. 2014) ("[A] plaintiff must only show that the employer's action would cause a 'reasonable worker' to be dissuaded from making or supporting a charge of discrimination." (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006))), *overruled on other grounds by Ortiz*, 834 F.3d 760. But courts have concluded that complaints of negative performance reviews, written warnings, and placement on performance improvement plans also do not meet this lower standard where unaccompanied by a quantitative or qualitative

---

[10] Mahran does not present any argument in response to the motion for summary judgment that retaliation occurred through the creation of a hostile work environment or the failure to provide him with the same training opportunities as non-Muslim pharmacists, abandoning these alleged adverse employment actions mentioned in his complaint.

33

change in the terms of employment. *See Lauth*, 863 F.3d at 717; *Gaston v. Bd. of Educ. of City of Chicago*, No. 17 C 1024, 2019 WL 398688, at *4 (N.D. Ill. Jan. 31, 2019) (collecting cases). As discussed above, Mahran has not shown that any immediate consequences accompanied the warnings, performance review, or PDN, and so he cannot base his retaliation claim on these events. The Court is left to examine whether a causal link exists between Mahran's numerous complaints to Advocate's management about racial discrimination and his termination.

Mahran may establish a causal link through an admission of discriminatory animus or "suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015). Mahran relies on a theory of suspicious timing, arguing that Advocate management had not reproached him prior to fall 2015. But, according to Mahran, after he began complaining of discrimination and requested a pay increase based on seniority and time off for religious holidays in late 2015 and early 2016, the negative performance review, corrective action, PDN, and ultimately termination followed.[11] "Although suspicious timing alone is rarely enough to create an inference of retaliatory motive, it can sometimes raise an inference of a causal connection, especially in combination with other evidence." *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1021 (7th Cir. 2016). But Mahran misstates the facts in an attempt to create an inference of causal connection based on suspicious timing. Instead of complaints to management of discrimination beginning only in fall 2015, Mahran's complaints go back to the beginning of his employment with Advocate. For example, Mahran complained of discriminatory conduct during his training period in April 2014, with

---

[11] Mahran's complaint also identifies as protected activity his 2016 IDHR charge. But Mahran makes no mention of the IDHR charge in his response to the motion for summary judgment, focusing instead on his informal complaints of discrimination, and he does not suggest any causal connection exists between his filing of the charge and his termination. The Court therefore deems this basis for protected activity abandoned.

management responding by coaching the employees involved.  Advocate hired him to a full-time pharmacist position after this complaint and also gave him a meets expectations rating in his August 2014 performance review, undermining an inference that his complaints necessarily led to adverse actions.  *See Morrill v. Nielsen*, No. 17-cv-3419, 2018 WL 3141798, at *13 (N.D. Ill. June 27, 2018) (noting that no causal connection existed where supervisor participated in decision to promote plaintiff a month after allegedly protected conduct).  Similarly, in claiming that his request for a pay raise soon before his April 2016 review and the subsequent termination suggests a causal link, he ignores that he made a similar request in June 2014 and received a pay adjustment soon thereafter.  Mahran also cannot claim he did not receive counseling or negative evaluations of his work before the events leading up to his termination.  Brown-Scott indicated in his reviews during his probationary period and thereafter that Mahran had knowledge deficits and needed to improve his performance in certain areas.  He also received a Level 1 warning in August 2015, negating his claim that Advocate gave him the Level 3 warnings in April and May 2016 without any prior warning.

Ultimately, Mahran cannot connect any of his complaints to management about discrimination to his termination, which Advocate based on failure to comply with the PDN.  He has not provided any evidence suggesting that Advocate would not have issued the PDN or found he failed to comply with it but for his complaints of discrimination, particularly where his supervisors had identified some of the issues raised in the PDN from the beginning of his employment with Advocate.  *See Chaib*, 744 F.3d at 987 (finding that plaintiff had not provided necessary evidence to meet causation requirement where "the poor performance review lacks any indication that it would not have been issued but for her complaints").  And while some of Mahran's complaints of discrimination took place close in time to his termination, Advocate

acted on these complaints, holding meetings to discuss his concerns. Malito also reviewed Mahran's complaints and determined that Advocate was following its policies and procedures in its treatment of Mahran, and Mahran does not complain about Malito's evaluation. Finally, as discussed above in connection with his discrimination claim, Mahran has not provided sufficient evidence to suggest that Advocate's reason for his termination amounted to pretext. *See Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018) (finding plaintiff did not provide additional evidence, such as pretext, to support an inference of causation where plaintiff relied mainly on suspicious timing). Therefore, the Court finds it appropriate to grant summary judgment for Advocate on Mahran's retaliation claims.

## V.  Common Law Retaliatory Discharge Claim (Count IX)

Mahran also bring a common law retaliatory discharge claim, contending that his termination violates Illinois public policy prohibiting discrimination based on religion, national origin, or ethnicity. In his response to Advocate's summary judgment motion, in which Advocate argued that the IHRA covers the complained-of conduct and so preempts any common law claim and that prohibiting discrimination is not a recognized public policy for purposes of such a claim, Mahran only responds that the IHRA does not directly address religious discrimination.[12]

The Court agrees with Advocate that the IHRA preempts Mahran's common law retaliatory discharge claim. The IHRA sets forth a "comprehensive scheme of remedies and administrative procedures" to address alleged human rights violations. *Mein v. Masonite Corp.*, 485 N.E.2d 312, 315, 109 Ill. 2d 1, 92 Ill. Dec. 501 (1985). This "comprehensive scheme" is the "exclusive source for redress of human rights violations" under Illinois law. *Id.* Specifically, the

---

[12] The Court finds this assertion baffling, where Mahran also seeks to recover under the IHRA for religious discrimination and retaliation. *See* Doc. 1 ¶¶ 96–98 (IHRA discrimination claim); *id.* ¶¶ 100–103 (IHRA retaliation claim).

IHRA states that "[e]xcept as otherwise provided by law, no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in this Act." 775 Ill. Comp. Stat. 5/8-111(D). "This provision divests courts, both state and federal, of jurisdiction to hear state law claims of civil rights violations unless those claims are brought under the IHRA." *Bell v. LaSalle Bank N.A./ABN AMRO N.A., Inc.*, No. 03 C 0607, 2005 WL 43178, at *2 (N.D. Ill. Jan. 10, 2005).

To determine whether the IHRA preempts a claim, the Court must decide whether the claim is "inextricably linked" to an alleged violation of an employee's civil rights under the IHRA. *Maksimovic v. Tsogalis*, 687 N.E.2d 21, 23, 177 Ill. 2d 511, 227 Ill. Dec. 98 (1997). A claim is not inextricably linked to a civil rights violation if the plaintiff can allege its elements "without reference to legal duties created by the [IHRA]." *Id.* Mahran cannot do so here, where the IHRA encompasses discrimination and retaliation based on religion, national origin, and ancestry. 775 Ill. Comp. Stat. 5/1-102, 5/6-101. He does not attempt to rely on any public policy outside of that embodied in the IHRA as a basis for his retaliatory discharge claim. *See Corluka v. Bridgford Foods of Ill., Inc.*, 671 N.E.2d 814, 817, 284 Ill. App. 3d 190, 219 Ill. Dec. 647 (1996) (retaliatory discharge claim preempted where the IHRA provided the legal duty prohibiting sexual harassment). Therefore, the Court enters judgment for Advocate on Mahran's common law retaliatory discharge claim.

## VI. FLSA Claim (Count V)

Finally, the Court addresses Mahran's claim that Advocate denied him overtime pay in violation of Section 7 of the FLSA, 29 U.S.C. § 207(a). The FLSA requires employers to pay employees overtime for time worked beyond forty hours in a week. 29 U.S.C. § 207(a)(1). But the FLSA exempts from this requirement those employed in "a bona fide executive,

administrative, or professional capacity." 29 U.S.C. § 213(a)(1). Advocate argues that the so-called "learned professional" exemption applies to Mahran. To meet this exemption, Mahran must have (1) been compensated on a salary or fee basis greater or equal to $455 per week, and (2) had as his primary duty the performance of work "[r]equiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.300. Advocate bears the burden to show that Mahran qualifies for the learned professional exemption. *Blanchar v. Std. Ins. Co.*, 736 F.3d 753, 756 (7th Cir. 2013). The parties do not dispute that he meets the first component, instead focusing on the second.

The regulations specify that a "field of science or learning" includes pharmacy work. 29 C.F.R. § 541.301(c). The main issue becomes whether Mahran performed "work requiring advanced knowledge," which means "work which is predominantly intellectual in character, and which includes work requiring the consistent exercise of discretion and judgment, as distinguished from performance of routine mental, manual, mechanical or physical work." 29 C.F.R. § 541.301(b). He contends that, as a pharmacist for Advocate, his work did not require the consistent exercise of discretion and judgment. The administrative exemption for the FLSA defines "discretion and independent judgment" as involving "the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). Although the Secretary of Labor has indicated that the phrase "discretion and judgment" for the learned professional exemption is "less stringent" than that for the administrative exemption, the Court may still consider it as guidance as to what qualifies under the learned professional exemption. *See* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer

38

Employees, 69 Fed. Reg. 22,122, 22,151 (Apr. 23, 2004); *Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 536 (7th Cir. 1999) (discussing discretion and judgment under both the administrative and professional exemptions together, noting that the "use of *independent* judgment necessarily implied the use of judgment generally), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013). The Court must consider "all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a).

As a pharmacist at Advocate, among other duties, Mahran verified orders, made recommendations to nurses and physicians, verified the prescriptions prepared by technicians, and made clinical interventions for patients, adjusting the dose or frequency of a patient's medication based on new lab results. He had to independently oversee patients and determine the appropriateness, safety, and efficacy of their drug therapy regimes. Any changes made, however, occurred in consultation with a doctor or nurse. Mahran therefore argues that he did not have final judgment in dispensing medications or the ability to adjust orders on his own, with such responsibility falling to doctors. Instead, he claims that his work falls closer to "routine mental, manual, mechanical or physical work."

Although Mahran ultimately worked with doctors and nurses, he nonetheless exercised sufficient discretion and judgment to fall within the learned professional exemption. Unlike in *Raimondi v. Central DuPage Hospital*, No. 15 C 7780, 2017 WL 1178513, at *4 (N.D. Ill. Mar. 30, 2017), where the plaintiff's job focused on data entry, even though she had a nursing degree, here, Mahran put his skilled knowledge to work as a pharmacist, verifying prescriptions to ensure they were appropriate for each patient and filled correctly. As the First Circuit has found with respect to pharmacists, the act of evaluating the safety and appropriateness of each prescription itself involves judgment and requires the use of advanced training. *De Jesus-Rentas*

*v. Baxter Pharm. Servs. Corp.*, 400 F.3d 72, 75 (1st Cir. 2005); *see also Pippins v. KPMG, LLP*, 759 F.3d 235, 243 (2d Cir. 2014) ("[T]he learned professions exemption applies if workers rely on advanced knowledge of their specialty to exercise discretion and judgment that is characteristic of their field of intellectual endeavor.").  Even the Seventh Circuit recognizes that consultation with others does not defeat such a finding.  *See Piscione*, 171 F.3d at 536 ("[M]any individuals who exercise discretion and independent judgment often do so after consultation with others.  Consultation . . . does not mean an abdication of an individual's own discretion or independent judgment.  Consulting with others supplements the information an individual has in order to reach a final judgment.").  Nor does needing approval from management.  *Id.* at 535 ("Even though an employee's work is subject to approval, even to the extent that a decision may be reversed by higher level management, it does not follow that the work did not require the exercise of discretion and independent judgment." (quoting *Dymond v. United States Postal Serv.*, 670 F.2d 93, 96 (8th Cir. 1982))); *see also* 29 C.F.R. § 541.202(c) (in discussing the exercise of discretion and independent judgment for purposes of the FLSA's administrative exemption, noting that "[t]he decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action").  Finally, even though Mahran's job may have included some routine work, this does not remove him from the learned professional exemption.  *Piscione*, 171 F.3d at 543.  Therefore, the Court agrees with Advocate that Mahran meets the learned professional exemption, where he and other pharmacists in the department "use their specialized knowledge to make numerous discretionary decisions including how to follow up with a physician over a questionable prescription; when a drug should not be dispensed because of a potential danger to the patient;

and how to assign, supervise, and review the work of the technicians." *De Jesus-Rentas*, 400 F.3d at 77. As an exempt employee, his FLSA overtime claim fails.

## CONCLUSION

For the foregoing reasons, the Court grants Advocate's motion for summary judgment [33]. The Court enters judgment for Advocate on Mahran's complaint, except to the extent he asserts a claim for religious discrimination based on a failure to accommodate. At the next status hearing, the parties should be prepared to address how they want to proceed on the failure to accommodate claim discussed in this Opinion.

Dated: February 26, 2019

_____
SARA L. ELLIS
United States District Judge

41